## THE CITY OF BOSTON.

(District Court, D. Massachusetts. July 9, 1907.)

### No. 1,765.

1. SHIPPING—PROCEEDING FOR LIMITATION OF LIABILITY—PERSONS CONCLUDED BY DECISION.

Where the question of fault for a collision between two vessels was determined in a proceeding by the owner of one of the vessels for a limitation of liability, in which proceeding all damage claimants were cited to appear and had the opportunity to be heard, the decision on such question is conclusive on such a claimant although he did not appear.

[Ed. Note.—Limitation of liability of vessel owners, see note to The Longfellow, 45 C. C. A. 387.]

2. SAME—SCOPE OF PROCEEDING—CLAIMS PROVABLE.

In a proceeding by a vessel owner for limitation of liability growing out of the sinking of the vessel in a collision, although she is exonerated from fault for the collision, a claim for injury to a passenger resulting from the alleged negligence of the vessel after the collision is within the scope of the proceedings and may be proved therein.

3. SAME—SINKING OF VESSEL IN COLLISION—DUTY TO PASSENGERS.

Where a vessel with passengers on board was sunk as the result of a collision, those in charge were bound to use the utmost exertions in their power to avert injury to the passengers from the impending peril, which duty continued until the passengers were safely landed, but the vessel is not liable for injuries resulting from errors of judgment in the emergency on the part of those in charge who were in general competent.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 538.]

4. SAME—INJURY TO PASSENGER—LIABILITY OF VESSEL.

Claimant was a passenger on petitioner's ferryboat which was sunk as the result of a collision in the evening. On discovering that the vessel was sinking, immediately after the collision the master ran her ashore into shallow water. A member of the crew went through the cabin on the lower deck, and notified claimant and all other passengers, who were few in number, that the boat was sinking, and to go up to the upper deck, and remained until he supposed all had preceded him there. Claimant did not go with the others, and, becoming confused, remained until the water entered and she became wet, but was afterwards assisted to the upper deck by some man who discovered her, and later was sent ashore in a boat with the other passengers. She suffered injury from the wetting and exposure, but it did not appear that those in charge knew of her having been in the water. *Held,* that there was no negligence on the part of the vessel which rendered it liable for the injury.

In Admiralty. Proceeding for limitation of liability. On claim for loss, damage, and injury presented by Mary L. and Vernon B. Davenport.

John O. Teele and Arthur P. Teele, for Winnisimmet Co.

William A. Davenport, for Mary L. and Vernon B. Davenport.

DODGE, District Judge. On December 18, 1906, leave was given these two damage claimants to file their respective answers, which had not been received at the clerk's office until after the time limited in the monition had expired. A motion by Mary L. Davenport to dismiss the proceedings or modify the restraining order has been denied, for reasons stated in the opinion filed on the above date. A hearing has since been had on the merits of both the claims which the answers seek to establish.

I find that Mary L. Davenport was a passenger on board the petitioner's ferryboat City of Boston, at the time of the collision between that boat and Scow 34, belonging to the Eastern Dredging Company, on March 13, 1904, which collision is described both in the petition and also in her answer thereto, filed as of July 20, 1906, and amended since that date. She does not claim to have received any injury at the moment of collision, but the ferryboat, as both petition and answer allege, was sunk by the collision. She alleges that when the ferryboat sank "she was immersed in water and exposed to cold for several hours, so that it made her ill, and she suffered great pain of body and anguish of mind, and was severely wrenched and strained, and other injuries were then and there received by her, and she was incapacitated from working for a long space of time." She denies that the ferryboat was managed with due care, alleges that the collision could not have occurred if proper lights and especially a search light had been used, and alleges, also, that negligence on the part of the ferryboat contributed to the collision. She alleges, after denying what is alleged in the third article of the petition, that the damages sustained by her were due to the petitioner's negligence, and were with its privity and knowledge.

By a petition filed in this court November 23, 1904, the Eastern Dredging Company, owner of Scow 34 with which the City of Boston collided, sought to limit its liability as owner of the scow for all damage caused by this same collision. It has been adjudged in the proceedings had under that petition that Scow No. 34 was solely to blame for the collision, and the dredging company as its owner solely liable for the damage thereby caused. See the opinion filed in that case March 15, 1906. The case is No. 1,669 on the docket of this court, and the record in it, which was admitted against these claimants' objection, shows that a monition was issued November 26, 1904, in accordance wherewith the Winnisimmet Company and any and all persons claiming damages for loss of property or personal injuries due to the collision were summoned, by service on the company named, and by publication, to prove their claims on or before March 3, 1905. In a letter to the dredging company's counsel, dated November 28, 1904, Mrs. Davenport's counsel who had previously brought suit for her against the dredging company in a state court waived any further service upon her of the monition, and also of the restraining order issued on the same day and served in like manner upon the Winnisimmet Company, and by publication. This order enjoined the prose-

cution of any and all suits upon claims against Scow 34 or the petitioner as her owner arising out of the collision; except in the limited liability proceedings. Mary L. and Vernon B. Davenport were bound by this monition and restraining order. They have also had full opportunity to intervene and prove any claims such as the monition and restraining order described against Scow 34 in the limited liability proceedings referred to. Whether the collision was caused by negligence on the part of the ferryboat or its owner, or by negligence on the part of Scow 34 and its owner, or on the part of both, were questions necessarily involved in those proceedings. Neither Mary L. nor Vernon B. Davenport appeared in them, but, having had the right and full opportunity to do so, they are bound by the result, and cannot, now that the court has, by its decree entered in those proceedings, held that there was no negligence on the part of the ferryboat, expect it to reopen that question for the purposes of this case.

The claim made by Mary L. Davenport in her answer as amended February 6, 1907, is that she was injured by being immersed in water when the ferryboat sank, and that "her said injury, loss, and damage was occasioned and incurred by the petitioner." It is obvious that although the collision was not caused by any fault on the petitioner's part, it may nevertheless have been true, if Mrs. Davenport was immersed in water afterward, that the petitioner was responsible for this occurrence. If the petitioner's master and crew might, notwithstanding the collision, have prevented this passenger from injury after it occurred and negligently failed to do so, its liability for such negligence would be liability which it has the right to limit in these proceedings. The proceedings might properly embrace within their scope all loss, damage, or injury to any person or persons during the same trip, whether sustained at the same time or at different times, and whether due to one instance of negligence or to different instances. The City of Norwich, 118 U. S. 468, 491, 6 Sup. Ct. 1150, 30 L. Ed. 134.

There is no question that the collision caused the ferryboat to fill and sink within a short time afterward. But before she sank she was steered into shallow water by her master, so that when on the bottom the water was only about four feet deep on her main deck. With this part of the management of the boat after the collision no fault is found.

The evidence in support of Mrs. Davenport's claim, consisting principally of her own testimony, tends to show that she was on board as a passenger, sitting in the ladies' cabin; that the shock of collision produced excitement among the passengers there; that a man ran through the cabin followed by several other persons, shouting to the passengers to go on deck because the boat was sinking; that all the other passengers then left the cabin and she followed after them, that she lost sight of the others after leaving the cabin, and went by herself first into the men's cabin on the opposite side, and thence back into the passageway for horses between the two cabins; that, while there, a wave came over the deck striking her and causing her to fall down twice in the water; that she then got hold of an upright pole

and clung to it for from 20 to 30 minutes, during which time the water rose nearly to her waist; that a man at last came to where she was, took her arm, and led her to the stairway by which the upper deck was reached; that she was then taken into the pilot house where the other women passengers were, until they were all passed into a boat which landed them at the Chelsea Ferry slip. That nothing further was done to assist them; that she walked to Chelsea Square and thence to her place of destination, being her sister's house at 100 Broadway, arriving there wet through, and with her wet clothes partly frozen. That the wetting and exposure resulted in her serious illness and permanent loss of health. She testified that when the water first came over the main deck she saw no one else there, but that two men afterward appeared, and for a time clung also to the same pole to which she was clinging. There was no other witness, however, who saw her clinging to any pole, or who saw her on the lower deck at any time after the collision.

The petitioner's evidence tended to show that neither Mrs. Davenport nor any other woman could have been on the lower deck after the collision, that when she was taken ashore with the other passengers she gave her name, but said nothing about being wet or having been in the water, and that she was not wet when put into and landed from the boat which took her ashore.

That Mrs. Davenport was in fact wet through, and did in fact have her clothing partly frozen when she reached her sister's house, was confirmed by the testimony of her sister Mrs. Morris and a nephew Mr. Greene, who were at the house when she arrived. Unless it is sufficiently contradicted by the petitioner's evidence I see no reason why her account of what happened on board after the collision is not to be accepted as substantially true.

The crew of the ferryboat, besides the master, who was all the time in the pilot house and at the wheel, were four in number, an engineer and fireman in charge of the machinery below, and two men, Gaillac and Hiscock, who were accustomed to take turns in remaining on the main deck in order to keep lookout forward and look after the passengers. Gaillac was the man on the main deck at this time. Hiscock was in the pilot house with the master. He remained on the upper deck after the collision until after the ferryboat had grounded. Gaillac then joined him there as will presently be stated, and they together launched a small boat kept on board for such emergencies. It was not this boat however that was used in taking the passengers ashore, that work was done by a boat and men from the U. S. Life Saving Station near by, who at once came off and offered their assistance.

The entire duty of warning the passengers and getting them to the upper deck was performed by Gaillac alone. No part was taken in performing it by any other member of the ferryboat's crew, so far as appeared. Hiscock did not go to the main deck at all until after Gaillac, with all the passengers as he supposed, had reached the upper deck and the ferryboat had been resting for some time on the bottom. The engineer and fireman did not testify.

Gaillac's evidence was that he went through both cabins as soon as the boat was found to be sinking, warned the passengers out, saw them all out of the cabins and all on their way up the stairs which led to the upper deck, before he left the main deck himself. No passenger, according to his evidence, then remained on the main deck, nor did any water come there until they had all left that deck. The water did not begin to come there until after all the passengers that he knew of had gone above, and just as it began to come he went to the upper deck himself, and at once joined Hiscock in launching the small boat.

Gaillac, however, is shown to have been mistaken in believing that he had seen all the passengers on their way to the upper deck before he went there himself. However it may have been with Mrs. Davenport, there were two men who remained on the main deck after he left it, were there when the water came over the deck, remained there for some time in the water, and reached the deck above after Gaillac did, both of them more or less wet. One of these men came up very soon after Gaillac came. The other, who appeared to be somewhat intoxicated, clung to a post below until Gaillac got a ladder, went down to him and got him up also. Only one of the main deck lights was put out by the collision, the others were burning, it was not dark there, and Hiscock, looking down from above, discovered the man last mentioned some minutes after the boat had sunk. Gaillac and Hiscock say they never saw any woman at all on the main deck after the sinking, and are certain that they must have seen Mrs. Davenport if she had really been there. But it is clear that neither of them was looking there all the time, and that there was much else demanding their attention where they were. I am unable to regard their evidence and the other evidence tending to show that Mrs. Davenport was not wet when she was taken ashore as sufficient to contradict her testimony and call upon me to reject it entirely. I accept it as true in its main features, and find that she was left below when the other passengers, followed by Gaillac, went to the upper deck, that she did remain below in the water for some time, though probably for by no means so long a time as she thinks, until she was found and brought upstairs by some person not identified at the hearing.

Accepting her evidence as a substantially true account of what happened to her after the collision, has she proved negligence on the part of the ferryboat for which its owners are liable to her? Without fault in the ferryboat's management as I have held, that vessel was suddenly put in danger of sinking, and was caused to sink before the passengers on board could be landed. Most of them, including Mrs. Davenport, had sustained no direct injury by the collision, and notwithstanding it, those in charge of the ferryboat were bound to use the utmost exertions in their power to avert injury to them from the impending peril. Except as to injuries sustained notwithstanding all that such exertions could accomplish, the liability of the owners of the ferryboat as carriers of passengers continued until the passengers were safely landed, notwithstanding the disaster; just as the obligations of carriers of goods continue under similar circumstances. The Niagara v. Cordes,

21 How. 7, 27, 16 L. Ed. 41. But the degree of care and diligence required of carriers of passengers under any circumstances is not necessarily the utmost care and diligence which men are capable of exercising, it is "the utmost care consistent with the nature of the undertaking, and with a due regard for all the other matters which ought to be considered in conducting the business." Dodge v. Boston & Bangor Steamship Co., 148 Mass. 218, 19 N. E. 373, 2 L. R. A. 83, 12 Am. St. Rep. 541. And when the circumstances are those of sudden emergency, the result is not the criterion by which what was done is to be judged. Railroad Co. v. Reeves, 10 Wall. 176, 19 L. Ed. 909; Holladay v. Kennard, 12 Wall. 254, 20 L. Ed. 390; The Styria, 186 U. S. 1, 10, 22 Sup. Ct. 731, 46 L. Ed. 1027. The principle is familar in maritime cases that error of judgment in an emergency is not necessarily negligence or fault. It is not contended that the persons in charge were not competent for the duties of their respective positions, and if competent, the owners did not contract for their infallibility nor that they should do in an emergency precisely what after the event others may think would have been best. Lawrence v. Minturn, 17 How. 100, 110, 15 L. Ed. 58. These are the general rules by which the conduct of the ferryboat's crew on this occasion is to be judged.

The first thing necessary after the collision was to ascertain its effect on the ferryboat, and this was done without loss of time. What became of most urgent importance upon finding her to be sinking was to prevent her from sinking in deep water. Fortunately shallow water was not far off, and she was at once headed for it at full speed. That no time might be lost in getting her there it was obviously necessary that the captain, engineer, and fireman at least should not leave their posts until she was safely grounded. Hiscock's presence in the pilot house as assistant to the captain could hardly have been dispensed with during the same interval. The duty of getting the passengers to the upper deck devolved of necessity upon Gaillac alone, and he set about it as soon as the boat's condition, which he helped to ascertain, was known. There were not many passengers on board, and under the circumstances there is no ground in the fact that no one was sent to help him get them upstairs, for charging the boat with negligence toward any of them.

After telling all the passengers in the cabin to come on deck because the boat was sinking, I think Gaillac had the right to expect them to make haste and to keep together. Mrs. Davenport was there and heard what he said, as she admits. After leading the way out of the cabin, and then waiting until as he supposed they had all followed him out, and had preceded him up the stairs, I do not see how he could reasonably have been expected to return to the cabin to make sure that no one had remained so far behind as not to be then in his sight. The foot of the stairs according to the evidence was over 70 feet from the place where they had come out of the cabin. He might well believe that he could better perform his duty to the passengers by hurrying to the upper deck, as he did, and helping launch the small boat, of which there might be urgent need if the ferryboat should not float long enough to reach shallow water.

Mrs. Davenport testified that she hesitated to join the other passengers when they left the cabin because she was afraid of getting trampled on. Conceding the reasonableness of such a fear, to hold Gaillac in fault for not anticipating that she would keep so far behind the others as not to be in sight at all when the last of them had started up the stairs; that she would then come out of the cabin by herself, go to the other cabin instead of the stairs, and thus lose her way entirely—still seems to me unreasonable. That Galliac left her behind when he went upstairs was not in my opinion the result of any failure on his part to do all that could be expected of him under the circumstances. As to the fact that her presence below was not discovered sooner, she did not claim to have called out or to have given any signal or to have made any effort to attract attention. She was evidently found and taken to the stairs before the presence below of the two men was discovered. The fact that no one discovered her predicament earlier does not, in my opinion, show negligence under the circumstances.

I am obliged to hold that no liability of the petitioners to Mrs. Davenport is established by the evidence. This finding involves the further conclusion that the claim made by her husband, Vernon B. Davenport, for expenses borne by him and the loss of her services and society, is also not sustained by the evidence.

On November 29, 1905, at the trial of a suit at law brought by Mrs. Davenport against this petitioner in the Massachusetts superior court for the county of Franklin to recover for her alleged injuries sustained at the time of this collision, a verdict was rendered in her favor for $2,600 damages. Reference was made to that suit in the opinion dated December 18, 1906, in the present case. The petitioner's exceptions, as defendant in that suit, were pending when the present petition was filed. It is urged on Mrs. Davenport's behalf that the verdict ought to be treated in this court as conclusive against the petitioner on the question of its liability to her and as to the amount of her damages, because it voluntarily submitted to the jurisdiction of the state court, and went to trial there before it filed its petition here. That the petitioner did not lose its right to proceed here by its participation in the state court proceedings has already been held in this case. See the opinion of December 18, 1906, above referred to. That the verdict of the jury should, under the circumstances, be allowed the effect contended for I should be inclined to hold, if the questions submitted to the jury had been the same as those now presented for my decision. In re Old Dominion S. S. Co. (D. C.) 115 Fed. 845. Those questions are, was Mrs. Davenport injured by the petitioner's negligence after the collision? and, if so, in what amount? But the questions at issue before the jury in Franklin county are shown by the record to have been, was the collision due to negligence on the petitioner's part? if so, did Mrs. Davenport sustain injuries because of it while exercising due care herself? if so, in what amount? The jury thus found the ferryboat in fault for the collision. To that finding this court cannot give effect, having itself decided to the contrary. There is nothing to show that the jury's verdict imports a finding that the petitioner was guilty of

negligence independent of the collision, or that the damages it assessed were damages for negligence of that kind.

My decision must be that neither of these respondents has established any claim against the petitioner for damages for loss of property or personal injuries occasioned or incurred by reason of, or caused by or arising out of, the collision described in the petition.